JOHN GAVIGAN AND ELLEN GAVIGAN v. EDWARD EVANS AND BENJAMIN KILMASTER, SURVIVORS.

*Established fact—Passage of title—Modification of contracts—Right of sale—Presumptions of title.*

Where the testimony on both sides agrees in establishing a right in a party to sell property in dispute, it should not be left to the jury as an open question.

An agreement by parties for whom lumber is to be got out, to advance money and supplies to an amount stipulated, to the contractors, gives title to the supplies when furnished, and they belong to the contractors unless that contract is modified to the contrary.

A contract is not affected by a subsequent agreement which does not refer to it, and the provisions of which are not so framed as to furnish means for connecting them.

An understanding had subsequently with one of two joint contractors that certain property should not pass until paid for, without evidence of the price and terms of payment, and without any evidence of its connection with the lumber contract is not proven in such a manner that it can be applied as a modification of that contract and must be treated as a separate understanding.

Where authority is given to a person to sell property for the purpose of raising means to pay debts, the vendee cannot be required to see that the money is properly applied.

Abstract presumptions as to title from possession become inapplicable when evidence is introduced of the actual title.

Error to Alpena.    Submitted Jan. 27.    Decided April 13.

REPLEVIN.    Defendants bring error.    Reversed.

*Turnbull & McDonald* for plaintiffs in error.

*Kelley & Clayberg* for defendants in error.

CAMPBELL, J.    Evans and Kilmaster, as survivors of themselves and Henry Kilmaster, deceased, who had been partners, brought replevin against the Gavigans, and others not now in the record, for two oxen.    These oxen had been conveyed to Mrs. Gavigan by one Sebra Proper, who sold them under transfer from Albert Pinkham, who was owner of the assets of a firm of Pinkham & Flemming by whom these oxen and some other oxen and horses had been obtained from the firm of Evans, Kilmaster & Co.    Pinkham & Flemming had contracted to cut and sell certain timber to that firm, who were to advance $2800 in supplies, and make various other payments.    One important question on the trial was whether these oxen were furnished under that contract, or whether they had been delivered to Pinkham & Flemming to become their property when paid for.

It appeared also in the case that Pinkham executed a chattel mortgage on the oxen, which Henry Kilmaster, one of the firm of Evans, Kilmaster & Co., obtained from the mortgagee and had assigned in the name of Henry D. Kilmaster & Co. This mortgage was not properly recorded, and was ruled out as a ground of replevin, but some other questions arose in regard to it.    Other questions arose upon rulings.

The contract for lumber becomes important, as under the rulings the jury must have found that the oxen were subject to some other arrangement.    This contract was dated October 21, 1875, and bound Pinkham and Flemming to cut from

land described and sell two million feet of white pine timber to be delivered in rafts on or about June 10, 1876, at seven dollars and twenty-five cents per thousand. The quality and method of cutting were provided for. If the land should not provide enough white pine, of the required sizes, the deficiency was to be made up of Norway and smaller white pine of the largest attainable size at six dollars. Some white ash and basswood was also allowed for at fixed rates. Payments were to be made as follows : $2800 in supplies at cost in Bay City ; $1500 stumpage was to be paid to Mason, Luce & Co. ; $4500 in cash from time to time as the work progressed, until delivery, and the balance in 3, 6 and 9 months from delivery. The bill of sale from Mason, Luce & Co. of the timber was to be transferred as collateral security. No security was to be given by Evans, Kilmaster & Co.

The replevin suit was brought in August, 1876. The chattel mortgage was made March 29, 1876, and assigned May 30, 1876. The sale by Proper to Mrs. Gavigan was made August 8, 1876, a few days before suit.

The testimony for plaintiffs below, and some of the other testimony was in the form of copies of testimony given previously in another case wherein Proper had been tried for the larceny of the oxen and acquitted.

The testimony seems to have been uncontradicted that Henry Kilmaster consented to have the oxen sold, and the proceeds applied in paying the men employed by Pinkham. If the record is correct, it is difficult to see how this question could have been treated as an open one before the jury ; and it is not disputed that the oxen were released by Pinkham to Proper for the purpose of paying such debts, some of which Proper assumed to represent, and for which he had seized the property.

As much of the case seemed in the opinion of the court below to have turned upon the transaction between the firm of Pinkham & Flemming and that of Evans, Kilmaster & Co. at the time of the furnishing of the oxen, the nature of that transaction becomes material here, in one view of the case. Flemming testifies distinctly that they were furnished

as supplies. The only testimony to the contrary is Pinkham's. His version amounts to this: He dealt with the horses and oxen in various ways as if he owned them, made some sales and mortgages, and made other dispositions such as an owner would, but claims he did not own them. He says in substance that the oxen were bought to do the lumbering job, within a few days after the contract was made, and states—"Kilmaster was with me at the time for the purpose of helping me to buy supplies, and get some teams for me. We saw the cattle and liked them, and he bought them for me to get out timber for the company." "The cattle were not sold to me. They were furnished to me to be mine when paid for. They were to belong to the company until paid for." There is some other testimony of the same witness, not changing this in any material way.

This testimony, if believed by the jury, would indicate that the purchase of the oxen was entirely independent of the lumber contract. The witness does not swear that the consideration entered into any of the lumber arrangements, or in any way changed the obligations of the written contract. It is left in doubt whether Pinkham, on this theory, acted on behalf of Pinkham & Flemming or individually, and there is no evidence which would indicate whether such a purchase outside of the lumber contract would have been within Pinkham's authority. Moreover it does not appear what price, if any, was to be paid for the oxen, or when or how it was to be paid. Pinkham's testimony fails entirely to show what the bargain was, which he asserts, and, consequently, what were the rights of the various parties under it. For the purposes of the questions before us it is chiefly important to note that his testimony tends to show that if not regarded as supplies the oxen had nothing to do with the lumber contract. He is the only witness whose testimony bears in that direction.

Several requests to charge were made and refused, the purport of which was that, if the oxen were advanced under the written contract, they belonged to Pinkham & Flemming;—and further that the question of property depended

on the intention of the parties at the time of the transfer, to be gathered from the contract;—that under the contract plaintiffs below were bound to make advances in cash and supplies, and no lien would arise for such advances as against the cattle.

Upon the first of these propositions, which bore directly on the main issue, and on which definite instructions should have been given, the request was correct. The supplies and other advances to be furnished were in the nature of advance payments and when furnished belonged absolutely to Pinkham & Flemming. Upon this point it is claimed by defendants in error the court did charge substantially as requested.

There is a little difficulty in determining how far this is so. In an early part of the charge, the court instructed the jury that there was nothing in the written contract which retained in Evans, Kilmaster & Co. the title to any supplies furnished. But before giving any further directions on this matter the court referred at length to the claims of the plaintiffs below upon several points in the case, and instructed the jury concerning the chattel mortgage. Then referring also to defendant's claim, the court proceeded to tell the jury that it was a question for them to determine "whether there was any understanding or agreement between Pinkham & Flemming and the plaintiffs in this case, subsequent to this written agreement, by which the plaintiffs were to retain the general ownership of these cattle until such time as they were paid for by Pinkham & Flemming. If you should so find that there was such an understanding and agreement between Pinkham & Flemming, or between Pinkham for Pinkham & Flemming and the plaintiffs in this case, that the plaintiffs were to retain the general ownership of the property until such time as the property should be fully paid for by Pinkham & Flemming, and if you should find that Pinkham & Flemming did not pay for the cattle, then your verdict would be for the plaintiffs in the case; unless you should find that the plaintiffs, by some act of theirs afterwards, constituted Mr. Pinkham an agent, or in some way gave him authority to sell these cattle," etc. Upon a repetition of the request for a charge

that "if the oxen" were furnished under this written con-
tract for the "*supplies*" they became the absolute property
of Pinkham & Flemming, the court refused it, saying plain-
tiffs had a right to argue to the jury what conversation was
had between Pinkham and Kilmaster, and when; and further
that if not treated as part of the supplies within the meaning
of the written agreement, either of the parties could make
a contract concerning them.   Further language was used of
similar import.

There seems to have been a misapprehension as to the
points presented, and some confusion as to what had really
been testified.   The advances to be made under the written
contract were not confined to "supplies," in any technical
sense, but included $4500 in addition, to be advanced from
time to time.   Any advances, whether in cash or in property,
would become the property of Pinkham & Flemming.   But
further than this, it is to be observed that the case was treated
as if there had been evidence of some modification of the
written contract concerning advances.   We find no evidence
tending to show that, if these oxen were furnished under any
different understanding, it had anything to do with the lumber
contract.   If furnished conditionally, the oxen were to be
paid for specifically, and there is nothing to show that this
payment was to be made out of the lumber, or charged
against it.   And the jury were allowed to inquire whether
the oxen had been paid for, when there was no testimony
concerning their price whatever.   If there was any such
agreement as Pinkham averred, there was nothing by which
any one could find out its terms, beyond the single one that
it was conditional.   It seems to us that the jury were not
instructed in such a way as to give them the proper means of
judgment.

The court properly declined to tell them the continued
possession of Pinkham & Flemming created of itself a pre-
sumption of ownership to be rebutted by a preponderance of
evidence.   This was true as an abstract proposition, but when
the testimony was put in on both sides as to the title and its
origin, the question of possession became unimportant as a

presumption of title, and had little bearing except possibly as one of the circumstances marking the transaction.

The court erred in charging that if Proper had no title and if the property belonged to plaintiff they should recover. There was evidence tending to show that the property was disposed of by consent or direction of Henry Kilmaster, and Proper in that case had power to sell whether owning it or not. It was also error to refuse the instruction that, if Pinkham owned the property, his release to Proper was equivalent to a sale. Unless we have misunderstood the testimony there seems to be no contradiction concerning the authority given to Pinkham to sell, whether as owner or otherwise, and if so, the purchaser could not be required to see to the application of the purchase money by Pinkham or Proper, although the sale appears to have been made in fact for the purpose authorized. The charge given on this subject and the refusal of the one asked, left the jury to hold Mrs. Gavigan's title to depend on Pinkham's good faith.

The judgment should be reversed with costs and a new trial granted.

The other Justices concurred.